# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,
Department of Justice
Antitrust Division
450 Fifth Street, N.W., Suite 7000
Washington, D.C. 20530

*Plaintiff,*

v.

NEXSTAR BROADCASTING GROUP,
INC.,
545 E. John Carpenter Freeway
Suite 700
Irving, TX 75062,

and

MEDIA GENERAL, INC.,
333 E. Franklin Street
Richmond, VA 23219

*Defendants.*

**CASE NO.**

**JUDGE:**

**FILED:**

## COMPLAINT

The United States of America, acting under the direction of the Attorney General of the United States, brings this civil action to enjoin the acquisition by Nexstar Broadcasting Group, Inc. ("Nexstar") of Media General, Inc. ("Media General") (collectively, "Defendants"), and to obtain other equitable relief.

## I.    NATURE OF THE ACTION

1.    Pursuant to an Agreement and Plan of Merger dated January 27, 2016, Nexstar agreed to acquire Media General for approximately $4.6 billion.  Nexstar and Media General own and operate broadcast television stations in multiple Designated Market Areas ("DMAs") throughout the United States.

2.    Nexstar's and Media General's television stations compete head to head for the business of local and national companies that seek to advertise on broadcast television stations operating in the following DMAs:  Roanoke-Lynchburg, Virginia; Terre Haute, Indiana; Ft. Wayne, Indiana; Green Bay-Appleton, Wisconsin; Lafayette, Louisiana; and Davenport, Iowa/Rock Island-Moline, Illinois ("Quad Cities") (collectively, the "DMA Markets").  In each of these six DMAs, Nexstar and Media General together account for a substantial share of the broadcast television station advertising revenues in that DMA.

3.    Specifically, the Defendants operate three stations that account for approximately 41 percent of broadcast television station gross advertising revenues in the Roanoke-Lynchburg, Virginia DMA; three stations that account for approximately 100 percent of broadcast television station gross advertising revenues in the Terre Haute, Indiana DMA; three stations that account for approximately 51 percent of broadcast television station gross advertising revenues in the Ft. Wayne, Indiana DMA;  two stations that account for approximately 51 percent of broadcast television station gross advertising revenues in the Green Bay-Appleton, Wisconsin DMA; three stations that account for approximately 53 percent of broadcast television station gross advertising revenues in the Lafayette, Louisiana DMA; and three stations that account for approximately 56 percent of broadcast television station gross advertising revenues in the Quad Cities DMA.

4.      Nexstar and Media General also compete to license programming to multichannel video programming distributors ("MVPDs") for retransmission to MVPD subscribers and each operate at least one station affiliated with a major broadcast network in each of the DMA Markets.  Because MVPDs in each DMA Market retransmit the Defendants' programming to MVPD subscribers in those markets, Nexstar and Media General compete for viewers who are MVPD subscribers.

5.      If consummated, the proposed acquisition would eliminate the substantial head-to-head competition that currently exists between Nexstar and Media General and likely result in (1) higher prices for broadcast television spot advertising in each of the DMA Markets; and (2) higher licensing fees for the retransmission of broadcast television programming to MVPD subscribers in each of the DMA Markets.  Consequently, Defendants' proposed transaction likely would substantially lessen competition in those markets in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## II.      JURISDICTION, VENUE, AND COMMERCE

6.      The United States brings this action pursuant to Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, to prevent and restrain Nexstar and Media General from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

7.      The Court has subject matter jurisdiction over this action pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 25, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

8.      Nexstar and Media General are engaged in interstate commerce and in activities substantially affecting interstate commerce.  They each own and operate broadcast television stations in various locations throughout the United States.  They each sell television advertising for those stations and license programming to MVPDs for retransmission to MVPD subscribers.

3

Their television advertising sales and retransmission licenses have a substantial effect upon interstate commerce.

9.      Defendants have consented to venue and personal jurisdiction in this District. Therefore, venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(c).

### III.    THE DEFENDANTS

10.     Nexstar is a Delaware corporation with its headquarters in Irving, Texas.  Nexstar reported net operating revenues of over $890 million in 2015.  Nexstar owns, operates, or services broadcast television stations in 62 metropolitan areas.

11.     Media General is a Virginia corporation with its headquarters in Richmond, Virginia.  Media General reported net operating revenues of over $1.3 billion in 2015.  Media General owns, operates, or services broadcast television stations in 48 metropolitan areas.

### IV.    RELEVANT MARKETS

12.     The relevant product and geographic markets and lines of commerce and sections of the country for assessing this merger under Section 7 of the Clayton Act are (1) the sale of broadcast television spot advertising to advertisers targeting viewers in each of the DMA Markets and (2) the licensing of broadcast television programming to MVPDs that retransmit the programming to subscribers in each of the DMA Markets.

13.     A DMA is a geographic unit for which A.C. Nielsen Company—a firm that surveys television viewers—furnishes broadcast television stations, MVPDs, cable and satellite television networks, advertisers, and advertising agencies in a particular area with data to aid in evaluating audience size and composition.  DMAs are widely accepted by television stations, MVPDs, cable and satellite television networks, advertisers, and advertising agencies as the

standard geographic area to use in evaluating television audience size and demographic composition. The Federal Communications Commission ("FCC") also uses DMAs as geographic units with respect to its MVPD regulations.

14.     Nexstar and Media General sell television advertising to local and national advertisers in each of the DMA Markets. Nexstar's and Media General's television stations in each of the DMA Markets generate a significant amount of revenues by selling advertising to local and national advertisers who want to reach viewers in those markets. Spot advertising placed on television stations in a DMA is aimed at reaching viewing audiences in that DMA, and television stations broadcasting outside that DMA do not provide effective access to those audiences. For this reason, in the event of a small but significant increase in broadcast television advertising spot prices in a DMA Market, advertisers would not switch enough advertising purchases to television stations outside the DMA Market to render the price increase unprofitable.

15.     Spot advertising differs from network and syndicated television advertising. In contrast to spot advertising sales, television networks and producers of syndicated programs sell network and syndicated television advertising on a nationwide basis for broadcast in every market where the network or syndicated program is aired.

16.     Broadcast television stations attract viewers through their programming, which is delivered for free over the air or retransmitted to viewers, primarily through MVPDs. Broadcast television stations then sell advertising to businesses that want to advertise their products to television viewers. A television station's advertising rates typically are based on the station's ability, relative to competing television stations, to attract viewing audiences that have certain demographic characteristics that advertisers want to reach.

17.     Broadcast television spot advertising possesses a unique combination of attributes that set it apart from advertising using other types of media. Television combines sight, sound, and motion, thereby creating a more memorable advertisement. Moreover, broadcast television spot advertising generally reaches the largest percentage of all potential customers in a particular target geographic area and is therefore especially effective in introducing, establishing, and maintaining the image of a product. Other media, such as radio, newspapers, or outdoor billboards, are not desirable substitutes for broadcast television advertising. None of these media can provide the important combination of sight, sound, and motion that makes television unique and impactful as a medium for advertising.

18.     Like broadcast television, other satellite and cable television networks, such as those carried by MVPDs, combine elements of sight, sound, and motion, but they are not a desirable substitute for broadcast television spot advertising for two important reasons. First, broadcast television can reach well over 90 percent of homes in a DMA, while other satellite and cable television networks carried by MVPDs often reach many fewer homes. Even when several MVPDs within a DMA jointly offer television spot advertising through a consortium called an interconnect, MVPD spot advertising does not match the reach of broadcast television spot advertising. As a result, an advertiser can achieve greater audience penetration through broadcast television spot advertising than through advertising on satellite and cable television networks that MVPDs distribute. Second, because MVPDs may offer more than 100 channels, they fragment the audience into small demographic segments. Because broadcast television programming typically has higher rating points than other cable and satellite television networks that MVPDs distribute, broadcast television provides a much easier and more efficient means for an advertiser to reach a high proportion of its target demographic in a broad area.

19.     While media buyers often buy advertising on cable and satellite networks that MVPDs distribute, they do so not as a substitute for broadcast television spot advertising in the DMA Markets, but rather as a supplement, in order to reach a specific demographic (*e.g.*, 18-24 year olds) with greater frequency, or to target narrow geographic areas within a DMA. A small but significant price increase by broadcast television spot advertising providers would not be made unprofitable by advertisers switching to advertising on other cable and satellite networks distributed by MVPDs.

20.     Internet-based media is also not currently a substitute for broadcast television spot advertising. Although Online Video Distributors ("OVDs") such as Netflix and Hulu are important sources of video programming, as with cable and satellite television advertising on MVPDs, the local video advertising of OVDs lacks the reach of broadcast television spot advertising. Non-video Internet advertising, *e.g.*, website banner advertising, lacks the important combination of sight, sound, and motion that gives television its impact. Consequently, local media buyers currently purchase Internet-based advertising primarily as a supplement to broadcast television spot advertising, and a small but significant price increase by broadcast television spot advertising providers would not be made unprofitable by advertisers switching to Internet-based advertising.

21.     In addition, broadcast television stations negotiate prices individually with advertisers; consequently, television stations can charge different advertisers different prices. Broadcast television stations generally can identify advertisers with strong preferences to advertise on broadcast television stations in their DMAs. Because of this ability to price discriminate among customers, broadcast television stations may target with higher prices advertisers that view broadcast television in their DMA as particularly effective for their needs, while maintaining lower prices for more price-sensitive advertisers. As a result, a hypothetical

monopolist could profitably raise prices to those advertisers that view broadcast television as a necessary advertising medium, either as their sole means of advertising or as a necessary part of a total advertising plan.

22.     In addition to selling broadcast spot advertising, Nexstar and Media General independently license competing broadcast television programming to MVPDs for retransmission to MVPD subscribers in each of the DMA Markets.  MVPDs pay fees for these retransmission rights under a process known in the television industry and under FCC regulations as "retransmission consent."  As described below, in each of the DMA Markets, Nexstar and Media General each own and operate broadcast television stations that are affiliated with one of the major broadcast television networks, and their stations reach broad audiences. As a consequence of their retransmission agreements with MVPDs, Nexstar and Media General compete for viewers who are MVPD subscribers in each of the DMA Markets.

## V.     LIKELY ANTICOMPETITIVE EFFECTS

23.     Broadcast television station ownership in each of the DMA Markets is already highly concentrated.  In each of those markets, four stations—each affiliated with a major network—had more than 90 percent of gross broadcast television advertising revenues in 2015. Defendants' stations accounted for at least 40 percent of such revenues, reflecting that in each of the DMA Markets, Nexstar and Media General own and operate stations that are affiliated with one of the major broadcast television networks.  These networks offer popular programming that individually reach a much broader audience than any other video programming, including cable and satellite network programming carried by MVPDs and OVDs.  Consequently, bringing the Nexstar and Media General stations under common ownership would significantly concentrate the television viewing audiences in each of the DMA Markets.

24.    Market concentration is often one useful indicator of the likely competitive effects of a merger.  The more concentrated a market, and the more a transaction would increase concentration in a market, the more likely it is that the transaction would result in a meaningful reduction in competition that harms consumers.

25.    The Herfindahl-Hirschman Index ("HHI") is a standard measure of market concentration (defined and explained in Appendix A).  Under the *Horizontal Merger Guidelines* issued by the Department of Justice and the Federal Trade Commission, mergers resulting in highly concentrated markets (with an HHI in excess of 2,500) that involve an increase in the HHI of more than 200 points are presumed to be likely to enhance market power.

26.    Using 2015 gross broadcast television advertising revenues, the combination of Nexstar and Media General would result in HHIs in excess of 2,500 in each DMA Market:

| **Designated Market Area** | **Post-Acquisition HHI** |
| --- | --- |
| Roanoke-Lynchburg, Virginia | 3,300 |
| Terre Haute, Indiana | 9,800 |
| Fort Wayne, Indiana | 3,600 |
| Green Bay-Appleton, Wisconsin | 3,900 |
| Lafayette, Louisiana | 4,700 |
| Quad Cities, Iowa and Illinois | 4,200 |

These post-acquisition HHIs, which reflect increases of more than 200 points in each DMA Market, are well above the 2,500 threshold at which a merger is presumed likely to enhance market power.

27.    In addition to substantially increasing the concentration levels in each of the DMA Markets, the proposed transaction would combine television stations that are at least partial substitutes and vigorous competitors in markets with limited alternatives. In each of the DMA Markets, Defendants each have broadcast television stations that are affiliated with the major national television networks: ABC, CBS, NBC and FOX. In the Roanoke-Lynchburg, Virginia DMA, Nexstar owns and operates WFXR, a FOX affiliate; and Media General owns and operates WSLS-TV, an NBC affiliate. In the Terre Haute, Indiana DMA, Nexstar owns or operates WTWO, an NBC affiliate, and WAWV-TV, an ABC affiliate; and Media General owns and operates WTHI-TV, a CBS affiliate. In the Ft. Wayne, Indiana DMA, Nexstar owns and operates WFFT-TV, a FOX affiliate; and Media General owns and operates WANE-TV, a CBS affiliate. In the Green Bay-Appleton, Wisconsin DMA, Nexstar owns and operates WFRV-TV, a CBS affiliate; and Media General owns and operates WBAY-TV, an ABC affiliate. In the Lafayette, Louisiana DMA, Nexstar owns and operates KADN-TV, a FOX affiliate, and KLAF-LD, an NBC affiliate; and Media General owns and operates KLFY-TV, a CBS affiliate. In the Quad Cities DMA, Nexstar owns or operates WHBF-TV, a CBS affiliate, and KLJB, a FOX affiliate; and Media General owns and operates KWQC-TV, an NBC affiliate. Their respective affiliations with those networks, and their local news operations, provide Defendants' stations with a variety of competing programming options that are often each other's next-best or second-best substitutes for many viewers and advertisers.

28.    Advertisers benefit from Defendants' head-to-head competition in the sale of broadcast television spot advertising in the DMA Markets. Advertisers purposefully spread their advertising dollars across numerous spot advertising suppliers to reach their marketing goals most efficiently. After the proposed acquisition, advertisers in each of the DMA Markets would likely find it more difficult to "buy around" Defendants' combined stations in response to higher

advertising rates, than to "buy around" Nexstar's stations or Media General's stations, as separate entities, as they could have done before the proposed acquisition. Because a significant number of advertisers would likely be unable to reach their desired audiences as effectively unless they advertise on at least one station that Nexstar would control after the proposed acquisition, those advertisers' bargaining positions would be weaker, and the advertising rates they pay would likely increase.

29.    The proposed merger between Nexstar and Media General would also diminish competition in the negotiation of retransmission agreements with MVPDs in the DMA Markets. Post-acquisition, Nexstar would gain the ability to threaten MVPDs in each of the DMA Markets with the simultaneous blackout of at least two major broadcast networks: its own network(s) and Media General's network(s). That threatened loss of programming, and the resulting diminution of an MVPD's subscribers and profits, would significantly strengthen Nexstar's bargaining position with MVPDs. Prior to the merger, an MVPD's failure to reach a retransmission agreement with Nexstar for a broadcast television station might result in a blackout of that station and threaten some subscriber loss for the MVPD. But because the MVPD would still be able to offer programming on Media General's major network affiliates, which are at least partial substitutes for Nexstar's, many MVPD subscribers would simply switch stations instead of cancelling their MVPD subscriptions. After the merger, an MVPD negotiating with Nexstar over a retransmission agreement could be faced with the prospect of a dual blackout of major broadcast networks (or worse), a result more likely to cause the MVPD to lose subscribers and therefore to accede to Nexstar's retransmission fee demands. For these reasons, the loss of competition between the Nexstar and Media General stations in each DMA Markets would likely lead to an increase in retransmission fees in each DMA and, because

increased retransmission fees typically are passed on to consumers, higher MVPD subscription fees.

## VI.    ABSENCE OF COUNTERVAILING FACTORS

30.    De novo entry into each of the DMA Markets is unlikely. The FCC regulates entry through the issuance of broadcast television licenses, which are difficult to obtain because the availability of spectrum is limited and the regulatory process associated with obtaining a license is lengthy. Even if a new signal became available, commercial success would come, at best, over a period of many years. Thus, entry into each DMA Market's broadcast television spot advertising market would not be timely, likely, or sufficient to deter post-merger anticompetitive effects.

31.    Other broadcast television stations in each of the DMA Markets also likely would not increase their advertising capacity in response to a price increase by Nexstar. The number of 30-second spots in a DMA is largely fixed by programming and time constraints. This fact makes the pricing of spot advertising responsive to changes in demand. Adjusting programming in response to a pricing change is risky, difficult, and time-consuming. Network affiliates are often committed to the programming provided by the network with which they are affiliated, and it often takes years for a station to build its audience. Programming schedules are complex and carefully constructed, taking many factors into account, such as audience flow, station identity, and program popularity. In addition, stations typically have multi-year contractual commitments for individual shows. Accordingly, a television station is unlikely to change its programming sufficiently or with sufficient rapidity to overcome a small but significant price increase imposed by Nexstar.

32.    Entry into the licensing of major broadcast television network programming to MVPDs for retransmission in each of the DMA markets is similarly unlikely. The FCC regulates

the ability of MVPDs to import non-local broadcast station signals into a local market.

Consequently, in the event of a blackout of a major broadcast television network's signal, an

MVPD typically would not be allowed to import the signal from a non-local affiliate of that

broadcast television network.  Thus, entry would not be timely, likely, or sufficient to deter

Nexstar from engaging in anticompetitive price increases or other anticompetitive conduct in its

licensing of major broadcast television network programming to MVPDs for retransmission in

the DMA markets.

33.    Defendants cannot demonstrate acquisition-specific and cognizable efficiencies

that would be sufficient to offset the proposed acquisition's likely anticompetitive effects.

### VII.    VIOLATION ALLEGED

34.    The United States hereby repeats and realleges the allegations of paragraphs 1

through 33 as if fully set forth herein.

35.    Nexstar's proposed acquisition of Media General likely would substantially lessen

competition in interstate trade and commerce, in violation of Section 7 of the Clayton Act,

15 U.S.C. § 18. The proposed acquisition likely would have the following effects, among others:

      a.  competition in the sale of broadcast television spot advertising in each of the

          DMA Markets would be substantially lessened;

      b.  actual and potential competition among Nexstar and Media General in the sale of

          broadcast television spot advertising in each of the DMA Markets would be

          eliminated;

      c.  prices for spot advertising on broadcast television stations in each of the DMA

          Markets would increase, and the quality of services would decline; and

   d.  retransmission licensing fees to MVPDs in each of the DMA Markets would increase.

## VIII.  REQUEST FOR RELIEF

36.   The United States requests:

   a.  that the Court adjudge the proposed acquisition to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

   b.  that the Court permanently enjoin and restrain Defendants from carrying out the transaction, or entering into any other agreement, understanding, or plan by which Nexstar would acquire Media General;

   c.  that the Court award the United States the costs of this action; and

   d.  that the Court award such other relief to the United States as the Court may deem just and proper.

Dated:   September 2, 2016

Respectfully submitted,

FOR PLAINTIFF UNITED STATES:


_____
Renata B. Hesse (D.C. Bar #466107)
Acting Assistant Attorney General, Antitrust
Divsion


_____
Juan A. Arteaga
Deputy Assistant Attorney General


_____
Patricia A. Brink
Director of Civil Enforcement


_____
Owen M. Kendler
Asst. Chief, Litigation III Section


_____
Mark A. Merva* (D.C. Bar #451743)
Trial Attorney

United States Department of Justice
Antitrust Division
Litigation III Section
450 Fifth Street, N.W., Suite 4000
Washington, D.C. 20530
Phone: 202-616-1398
Facsimile: 202-514-7308
Email: Mark.Merva@usdoj.gov

*Attorney of Record

## APPENDIX A

The term "HHI" means the Herfindahl-Hirschman Index, a
commonly accepted measure of market concentration.  The HHI is
calculated by squaring the market share of each firm competing in the
market and then summing the resulting numbers.  For example, for a
market consisting of four firms with shares of 30, 30, 20, and 20 percent, the
HHI is 2,600 ($30^2 + 30^2 + 20^2 + 20^2 = 2,600$).  The HHI takes into account the
relative size distribution of the firms in a market.  It approaches zero when
a market is occupied by a large number of firms of relatively equal size and
reaches its maximum of 10,000 points when a market is controlled by a
single firm.  The HHI increases both as the number of firms in the market
decreases and as the disparity in size between those firms increases.

Markets in which the HHI is between 1,500 and 2,500 points are
considered to be moderately concentrated, and markets in which the HHI
is in excess of 2,500 points are considered to be highly concentrated.  *See*
U.S. Department of Justice & FTC, *Horizontal Merger Guidelines* § 5.3 (2010).
Transactions that increase the HHI by more than 200 points in highly

concentrated markets presumptively raise antitrust concerns under the

*Horizontal Merger Guidelines* issued by the Department of Justice and the

Federal Trade Commission.  *See id.*