**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| UNITED STATES OF AMERICA, |
| *Plaintiff,* |
| v. |
| NEXSTAR BROADCASTING GROUP, INC., and MEDIA GENERAL, INC., |
| *Defendants.* |

## COMPETITIVE IMPACT STATEMENT

Pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), Plaintiff United States of America ("United States") files this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in this civil antitrust proceeding.

## I. NATURE AND PURPOSE OF THE PROCEEDING

Defendants Nexstar Broadcasting Group, Inc. ("Nexstar") and Media General, Inc. ("Media General") (collectively, "Defendants") entered into an Agreement and Plan of Merger, dated January 27, 2016, pursuant to which Nexstar would acquire Media General for approximately $4.6 billion.  Defendants compete head-to-head in the sale of broadcast television spot advertising in the following Designated Market Areas ("DMAs"):  Roanoke-Lynchburg, Virginia; Terre Haute, Indiana; Ft. Wayne, Indiana; Green Bay-Appleton, Wisconsin; Lafayette, Louisiana; and  Davenport, Iowa/Rock Island-Moline, Illinois ("Quad Cities") (collectively, "the

DMA Markets"). Defendants also compete in the DMA Markets for viewers who are multichannel video programming distributor ("MVPD") subscribers.

The United States filed a civil antitrust Complaint on September 2, 2016, seeking to enjoin the proposed acquisition. The Complaint alleges that the proposed transaction likely would lead to (1) higher prices for broadcast television spot advertising in each of the DMA Markets and (2) higher licensing fees for the retransmission of broadcast television programming to MVPD subscribers in each of the DMA Markets. These likely competitive effects would substantially lessen competition in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

At the same time the Complaint was filed, the United States also filed a Hold Separate Stipulation and Order ("Hold Separate") and proposed Final Judgment, which are designed to eliminate the likely anticompetitive effects of the acquisition. The proposed Final Judgment, which is explained more fully below, requires Defendants to divest the following broadcast television stations (the "Divestiture Stations") to Acquirers approved by the United States in a manner that preserves competition in each of the DMA Markets:

- WBAY-TV, located in the Green Bay-Appleton, Wisconsin DMA;

- WSLS-TV, located in the Roanoke-Lynchburg, Virginia DMA;

- KADN-TV, located in the Lafayette, Louisiana DMA;

- KLAF-LD, located in the Lafayette, Louisiana DMA;

- WTHI-TV, located in the Terre Haute, Indiana DMA;

- WFFT-TV, located in the Ft. Wayne, Indiana DMA; and

- KWQC-TV, located in the Quad Cities DMA.

The Hold Separate requires Defendants to take certain steps to ensure that the Divestiture Stations are operated as competitively independent, economically viable, and ongoing business

concerns, uninfluenced by the consummation of the acquisition so that competition is maintained until the required divestitures occur.

The United States and Defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA.  Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof.

## II. DESCRIPTION OF THE EVENTS GIVING RISE TO THE ALLEGED VIOLATION

### A.    The Defendants and the Proposed Acquisition

Nexstar is a Delaware corporation with its headquarters in Irving, Texas.  Nexstar owns, operates, or services broadcast television stations in 62 metropolitan areas.

Media General is a Virginia corporation with its headquarters in Richmond, Virginia. Media General owns, operates, or services broadcast television stations in 48 metropolitan areas.

Pursuant to an Agreement and Plan of Merger, dated January 27, 2016, Nexstar agreed to acquire Media General for approximately $4.6 billion.

The proposed transaction, as initially agreed to by Defendants, likely would lessen competition substantially in each of the DMA Markets in (1) the sale broadcast television spot advertising and (2) the licensing of broadcast television programming to MVPDs for retransmission to MVPD subscribers.  This acquisition is the subject of the Complaint and proposed Final Judgment filed today by the United States.

**B.      The Transaction's Likely Anticompetitive Effects**

      **1.      Relevant Markets**

            **i.      Broadcast Television Spot Advertising in the DMA Markets**

The Complaint alleges that the sale of broadcast television spot advertising to advertisers targeting viewers located in each DMA Market constitutes a relevant market under Section 7 of the Clayton Act.

Nexstar and Media General sell television advertising to local and national advertisers that seek to target viewers in each of the DMA Markets.  A DMA is a geographical unit designated by the A.C. Nielsen Company, a company that surveys television viewers and furnishes broadcast television stations, advertisers, and advertising agencies in a particular area with data to aid in evaluating television audiences.  DMAs are widely accepted by television stations, advertisers, and advertising agencies as the standard geographic area to use in evaluating television audience size and demographic composition.  A television station's advertising rates typically are based on the station's ability, relative to competing television stations, to attract viewing audiences that have certain demographic characteristics that advertisers are seeking to reach.  The Federal Communications Commission ("FCC") also uses DMAs as geographic units with respect to its MVPD regulations.

Nexstar's and Media General's broadcast television stations in the DMA Markets generate almost all of their revenues by selling advertising to local and national advertisers who want to reach viewers present in those DMAs.  Advertising placed on broadcast television stations in a DMA is aimed at reaching viewing audiences in that DMA, and television stations broadcasting outside that DMA do not provide effective access to these audiences.

Broadcast television spot advertising possesses a unique combination of attributes that sets it apart from advertising using other types of media.  Because of this unique combination of attributes, broadcast television spot advertising has no close substitute for a significant number of advertisers.

Television combines sight, sound, and motion, thereby creating a more memorable advertisement when compared to other types of advertising.  For example, radio spots lack the visual impact of television advertising; and newspaper and billboard ads lack sound and motion, as do many internet search engine and website banner ads.

Broadcast television spot advertising also generally reaches the largest percentage of potential customers in a targeted geographic area and is therefore especially effective in introducing, establishing, and maintaining a product's image.

Spot advertising differs from network and syndicated television advertising, which are sold on a nationwide basis by major television networks and by producers of syndicated programs and are broadcast in every market area in which the network or syndicated program is aired.  Spot advertising on cable and satellite networks distributed by MVPDs and internet-based video advertising also lacks the same reach as broadcast television spot advertising.

In addition, through information provided during individualized price negotiations, broadcast television stations can identify advertisers with strong preferences for using broadcast television spot advertising and charge different prices to those advertisers.  Consequently, if there was a small but significant and non-transitory increase in the price ("SSNIP") of broadcast television spot advertising on broadcast television stations in the DMA Markets, advertisers would not reduce their purchases sufficiently to render the price increase unprofitable.

Moreover, advertisers would not switch enough purchases of advertising time to television stations outside the DMA Markets, or to other media to render the price increase unprofitable.

### ii.      Retransmission Licensing Fees in the DMA Markets

The Complaint also alleges that the licensing to MVPDs in each of the DMA Markets of broadcast television programming for retransmission to subscribers constitutes a relevant market under Section 7 of the Clayton Act.

In each of the DMA Markets, Nexstar and Media General each own and operate broadcast television stations that are affiliated with one of the major broadcast television networks.  Nexstar and Media General independently license the broadcast television programming from these stations to MVPDs to retransmit to the MVPDs' subscribers in each of the DMA Markets.  MVPDs pay fees for these rights under a process known in the television industry and under FCC regulations as "retransmission consent."  As a consequence of their retransmission agreements with MVPDs, Nexstar and Media General compete for viewers that are MVPD subscribers in each of the DMA Markets.  Nexstar's and Media General's stations are at least partial substitutes for these viewers.

### 2.      Harm to Competition in Each of the DMA Markets

The Complaint alleges that the proposed acquisition likely would substantially lessen competition in interstate trade and commerce, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and likely would have the following effects, among others:

  a) competition in the sale of broadcast television spot advertising in each of the DMA Markets would be substantially lessened;

  b) actual and potential competition between Nexstar and Media General in the sale of broadcast television spot advertising in each of the DMA markets would be eliminated;

  c) prices for spot advertising on broadcast television stations in each of the DMA Markets would increase, and the quality of services would decline; and

    d)  prices for retransmission licensing to MVPDs in each of the DMA Markets would increase.

The acquisition, by eliminating Media General as a separate competitor and combining its operations with those of Nexstar, would allow the combined entity to increase its market share of broadcast television viewers, spot advertising, and revenues in each of the DMA Markets. Specifically, the acquisition would give the merged company the following shares of broadcast television station gross advertising revenues in each DMA Market:

| **DMA** | **MARKET SHARE** |
|---|---|
| Roanoke-Lynchburg, VA | 41 percent |
| Terre Haute, IN | 100 percent |
| Ft. Wayne, IN | 51 percent |
| Green Bay-Appleton, WI | 51 percent |
| Lafayette, LA | 53 percent |
| Quad Cities, IA/IL | 56 percent |

As alleged in the Complaint, Nexstar's acquisition of Media General would further concentrate the already highly concentrated broadcast television market in each of the DMA Markets. Using the Herfindahl-Hirschman Index ("HHI"), a standard measure of market concentration, the post-acquisition HHI in each of the DMA Markets would exceed 2,500 and the transaction would increase each DMA Market's HHI by over 200 points. As a result, the proposed acquisition is presumed likely to enhance market power under the *Horizontal Merger Guidelines* issued by the Department of Justice and Federal Trade Commission.

Moreover, the acquisition combines stations that are at least partial substitutes and vigorous competitors in a product market with limited alternatives.  In each of the DMA Markets, Defendants have broadcast stations that are affiliated with the major national television networks:  ABC, CBS, NBC, and FOX.  Their respective affiliations with those networks, and their local news operations, provide Defendants' stations with a variety of competing programming options that are often each other's next-best or second-best substitutes for viewers and advertisers.

As alleged in the Complaint, advertisers benefit from Defendants' competition in the sale of broadcast television spot advertising in the DMA Markets.  Advertisers purposefully spread their advertising dollars across numerous spot advertising suppliers to reach their marketing goals most efficiently.  After the proposed acquisition, advertisers in each of the DMA Markets would likely find it more difficult to "buy around" Defendants' combined stations in response to higher advertising rates than they could have done before the proposed acquisition.  Because a significant number of advertisers would likely be unable to reach their desired audiences as effectively unless they advertise on at least one station that Nexstar would control after the proposed acquisition, those advertisers' bargaining positions would be weaker, and the advertising rates they pay would likely increase.

The proposed merger would also diminish competition in the negotiation of retransmission agreements with MVPDs in the DMA Markets.  The acquisition would provide Nexstar with the ability to threaten MVPDs in each of the DMA Markets with the simultaneous blackout of at least two major broadcast networks: its own network(s) and Media General's network(s).  That threatened loss of programming, and the resulting diminution of an MVPD's subscribers and profits, would significantly strengthen Nexstar's bargaining

position.  Prior to the merger, an MVPD's failure to reach a retransmission agreement with Nexstar for a broadcast television station might result in a blackout of that station and threaten some subscriber loss for the MVPD.  But because the MVPD would still be able to offer programming on Media General's major network affiliates, which are at least partial substitutes for Nexstar's affiliates, many MVPD subscribers would simply switch stations instead of cancelling their MVPD subscriptions.  After the merger, an MVPD negotiating with Nexstar over a retransmission agreement could be faced with the prospect of a dual blackout of major broadcast networks (or worse), a result more likely to cause the MVPD to lose subscribers and therefore to accede to Nexstar's retransmission fee demands. For these reasons, the loss of competition between the Nexstar and Media General stations in each DMA Market would likely lead to an increase in retransmission fees in those markets and, because increased retransmission fees typically are passed on to consumers, higher MVPD subscription fees.

### 3.      Entry

The Complaint alleges that entry or expansion in broadcast television spot advertising and the licensing of major broadcast television network programming to MVPDs for retransmission in each of the DMA Markets would not be timely, likely, or sufficient to prevent any anticompetitive effects.

With respect to broadcast television spot advertising, new entry is unlikely because any new station would require an FCC license, which is difficult to obtain.  Even if a new station became operational, commercial success would come over a period of many years.  Because the number of 30-second spots available at a station is generally fixed, other television stations in each of the DMA Markets could not readily increase their advertising capacity in response to a SSNIP by Nexstar.

With respect to retransmission licensing fees, new entry of major broadcast television network programming for MVPD retransmission in each of the DMA Markets is unlikely.  The FCC regulates the ability of MVPDs to import non-local broadcast station signals into a local market.  Consequently, in the event of a blackout of a major broadcast television network's signal, an MVPD typically would not be allowed to import the signal from a non-local affiliate of that broadcast television network.  Thus, entry would not be timely, likely, or sufficient to deter Nexstar from engaging in anticompetitive price increases or other anticompetitive conduct after the proposed acquisition is consummated.

### III. <u>EXPLANATION OF THE PROPOSED FINAL JUDGMENT</u>

The divestiture requirement of the proposed Final Judgment will eliminate the likely anticompetitive effects of the acquisition in each of the DMA Markets by maintaining the Divestiture Stations as independent, economically viable competitors.  The proposed Final Judgment requires Nexstar to divest the Divestiture Stations to the following Acquirers:

- WBAY-TV, located in Green Bay-Appleton, Wisconsin, and KWQC-TV, located in Quad Cities to Gray Television, Inc.;

- WSLS-TV, located in Roanoke-Lynchburg, Virginia to Graham Holdings Company;

- KADN-TV and KLAF-LD, both located in Lafayette, Louisiana to Bayou City Broadcasting Lafayette, Inc.; and

- WTHI-TV, located in Terre Haute, Indiana, and WFFT-TV, located in Ft. Wayne, Indiana to USA Television MidAmerica Holdings, LLC.

The United States has approved each of these Acquirers as suitable divestiture buyers. The United States required Nexstar to identify each Acquirer of a Divestiture Station in order to

provide greater certainty and efficiency in the divestiture process. If, for any reason, Defendants are unable to complete the divestitures to one or more of these Acquirers, Defendants must divest the remaining Divestiture Stations to one or more alternative Acquirers approved by the United States in its sole discretion.

The "Divestiture Assets" are defined in Paragraph II.P of the proposed Final Judgment to include all assets, tangible or intangible, principally devoted to or necessary for the operation of the Divestiture Stations as viable, ongoing commercial broadcast television stations. With respect to each Divestiture Station, the divestiture will include assets sufficient to satisfy the United States, in its sole discretion, that such assets can and will be used to operate each station as a viable, ongoing, commercial television business. In addition, order to facilitate the continuous operations of the Divestiture Stations until the Acquirer(s) can provide such capabilities independently, Paragraph IV.G of the proposed Final Judgment provides that, at the option of an Acquirer, Defendants shall enter into a transition services agreement with the Acquirer for a period of up to six months.

To ensure that the Divestiture Stations are operated independently from Nexstar after the divestitures, Sections IV and XI of the proposed Final Judgment prohibit Defendants from entering into any agreements during the term of the Final Judgment that create a long-term relationship with or any entanglements that affect competition between Nexstar and an Acquirer of a Divestiture Station concerning the Divestiture Assets after the divestitures are completed. Examples of prohibited agreements include agreements during the term of the Final Judgment to reacquire any part of the Divestiture Assets; agreements to acquire any option to reacquire any part of the Divestiture Assets or to assign the Divestiture Assets to any other person; agreements to enter into any local marketing agreement, joint sales agreement, other cooperative selling

arrangement, or shared services agreement; agreements to conduct other business negotiations jointly with the Acquirer(s) with respect to the Divestiture Assets; and agreements to provide financing or guarantees of financing with respect to the Divestiture Assets.  The shared services agreement prohibition does not preclude Defendants from entering into an agreement pursuant to which an Acquirer can begin operating a Divestiture Station immediately after the Court's approval of the Hold Separate in this matter, so long as the agreement with the Acquirer expires upon the consummation of a final agreement to divest the Divestiture Assets to the Acquirer.

Defendants are required to take all steps reasonably necessary to accomplish the divestitures quickly and to cooperate with prospective purchasers.  Pursuant to Paragraph IV.A of the proposed Final Judgment, divestiture of each of the Divestiture Stations must occur within 90 calendar days after the filing of the Complaint, or five calendar days after notice of the entry of the Final Judgment by the Court, whichever is later.  The United States, in its sole discretion, may agree to one or more extensions of this time period not to exceed 90 calendar days in total, and shall notify the Court in such circumstances.

Because transferring the broadcast license for each of the Divestiture Stations requires FCC approval, Paragraph IV.A of the proposed Final Judgment specifically requires Defendants to use their best efforts to obtain all necessary FCC approvals as expeditiously as possible.  If applications have been filed with the FCC within the period permitted for divestiture seeking approval to assign or transfer licenses to the Acquirers of the Divestiture Assets, but an order or other dispositive action by the FCC on such applications has not been issued before the end of the period permitted for divestiture, the period shall be extended with respect to the divestiture of the Divestiture Assets for which no FCC order has issued until five calendar days after such order is issued.

In the event that Defendants do not accomplish all of the divestitures within the periods prescribed in the proposed Final Judgment, Section V of the proposed Final Judgment provides that the Court, upon application of the United States, will appoint a trustee selected by the United States to effect any remaining divestitures. If a trustee is appointed, the proposed Final Judgment provides that Nexstar will pay all costs and expenses of the trustee. The trustee's commission will be structured to provide an incentive for the trustee based on the price obtained and the speed with which the divestitures are accomplished. After his or her appointment becomes effective, the trustee will file monthly reports with the Court and the United States describing his or her efforts to accomplish the divestiture of any remaining stations. If the divestiture has not been accomplished after 6 months, the trustee and the United States will make recommendations to the Court, which shall enter such orders as appropriate, to carry out the purpose of the trust, including extending the trust or the term of the trustee's appointment.

## IV. REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no prima facie effect in any subsequent private lawsuit that may be brought against Defendants.

## V. PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States and Defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the

United States has not withdrawn its consent.  The APPA conditions entry upon the Court's
determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the
proposed Final Judgment within which any person may submit to the United States written
comments regarding the proposed Final Judgment.  Any person who wishes to comment should
do so within sixty (60) days of the date of publication of this Competitive Impact Statement in
the *Federal Register*, or the last date of publication in a newspaper of the summary of this
Competitive Impact Statement, whichever is later.  All comments received during this period
will be considered by the United States, which remains free to withdraw its consent to the
proposed Final Judgment at any time prior to the Court's entry of judgment.  The comments and
the response of the United States, if any, will be filed with the Court.  In addition, comments will
be posted on the Antitrust Division's website and, under certain circumstances, published in the
*Federal Register*.

Written comments should be submitted to:

Owen M. Kendler
Asst. Chief, Litigation III Section
Antitrust Division
United States Department of Justice
450 5th Street, N.W. Suite 4000
Washington, DC 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and
Defendants may apply to the Court for any order necessary or appropriate for the modification,
interpretation, or enforcement of the Final Judgment.

## VI. <u>ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT</u>

The United States considered, as an alternative to the proposed Final Judgment, a full trial on the merits against Defendants.  The United States could have continued the litigation and sought preliminary and permanent injunctions against Nexstar's acquisition of Media General.  The United States is satisfied, however, that the divestiture of assets described in the proposed Final Judgment will preserve competition for the sale of broadcast television spot advertising and for the licensing of broadcast television programming to MVPDs for retransmission to MVPD subscribers in each of the DMA Markets.  Thus, the proposed Final Judgment would achieve all or substantially all of the relief the United States would have obtained through litigation, but avoids the time, expense, and uncertainty of a full trial on the merits of the Complaint.

## VII. <u>STANDARD OF REVIEW UNDER THE APPA</u><br><u>FOR THE PROPOSED FINAL JUDGMENT</u>

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1).  In making that determination, the Court, in accordance with the statute as amended in 2004, is required to consider:

> (A)  the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

> (B)  the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint

> including consideration of the public benefit, if any, to be derived from a
> determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B).  In considering these statutory factors, the Court's inquiry is

necessarily a limited one as the government is entitled to "broad discretion to settle with the

defendant within the reaches of the public interest."  *United States v. Microsoft Corp.*, 56 F.3d

1448, 1461 (D.C. Cir. 1995); *see generally United States v. SBC Commc'ns, Inc.*, 489

F. Supp. 2d 1 (D.D.C. 2007) (assessing public interest standard under the Tunney Act); *United*

*States v, U.S. Airways Group, Inc.*, 38 F. Supp. 3d 69, 75 (D.D.C. 2014) (explaining that the

"court's inquiry is limited" in Tunney Act settlements); *United States v. InBev N.V./S.A.*,

No. 08-1965 (JR), 2009-2 Trade Cas. (CCH) ¶ 76,736, 2009 U.S. Dist. LEXIS 84787, at *3,

(D.D.C. Aug. 11, 2009) (noting that the court's review of a consent judgment is limited and only

inquires "into whether the government's determination that the proposed remedies will cure the

antitrust violations alleged in the complaint was reasonable, and whether the mechanism to

enforce the final judgment are clear and manageable.").[1]

As the United States Court of Appeals for the District of Columbia Circuit has held,

under the APPA a court considers, among other things, the relationship between the remedy

secured and the specific allegations set forth in the government's complaint, whether the decree

is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree

may positively harm third parties.  *See Microsoft*, 56 F.3d at 1458-62.  With respect to the

adequacy of the relief secured by the decree, a court may not "engage in an unrestricted

evaluation of what relief would best serve the public."  *United States v. BNS, Inc.*, 858 F.2d 456,

---

[1] The 2004 amendments substituted "shall" for "may" in directing relevant factors for court to consider and amended the list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms. *Compare* 15 U.S.C. § 16(e) (2004) *with* 15 U.S.C. § 16(e)(1) (2006); *see also SBC Commc'ns*, 489 F. Supp. 2d at 11 (concluding that the 2004 amendments "effected minimal changes" to Tunney Act review).

462 (9th Cir. 1988) (quoting *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981));

*see also Microsoft*, 56 F.3d at 1460-62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40

(D.D.C. 2001); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *3.  Courts have held that:

> [t]he balancing of competing social and political interests affected by a
> proposed antitrust consent decree must be left, in the first instance, to the
> discretion of the Attorney General. The court's role in protecting the
> public interest is one of insuring that the government has not breached its
> duty to the public in consenting to the decree. The court is required to
> determine not whether a particular decree is the one that will best serve
> society, but whether the settlement is "*within the reaches of the public
> interest*." More elaborate requirements might undermine the
> effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[2]  In determining whether a

proposed settlement is in the public interest, a district court "must accord deference to the

government's predictions about the efficacy of its remedies, and may not require that the

remedies perfectly match the alleged violations." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see also*

*U.S. Airways*, 38 F. Supp. 3d at 75 (noting that a court should not reject the proposed remedies

because it believes others are preferable); *Microsoft*, 56 F.3d at 1461 (noting the need for courts

to be "deferential to the government's predictions as to the effect of the proposed remedies");

*United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that

the court should grant due respect to the United States' prediction as to the effect of proposed

remedies, its perception of the market structure, and its views of the nature of the case).

Courts have greater flexibility in approving proposed consent decrees than in crafting

their own decrees following a finding of liability in a litigated matter.  "[A] proposed decree

---

[2] *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"). *See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

must be approved even if it falls short of the remedy the court would impose on its own, as long

as it falls within the range of acceptability or is 'within the reaches of public interest.'" *United*

*States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting

*United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd sub nom. Maryland*

*v. United States*, 460 U.S. 1001 (1983); *see also U.S. Airways*, 38 F. Supp. 3d at 76 (noting that

room must be made for the government to grant concessions in the negotiation process for

settlements) (citing *Microsoft*, 56 F.3d at 1461); *United States v. Alcan Aluminum Ltd.*, 605

F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would

have imposed a greater remedy).  To meet this standard, the United States "need only provide a

factual basis for concluding that the settlements are reasonably adequate remedies for the alleged

harms." *SBC Commc'ns*, 489 F. Supp. 2d at 17.

Moreover, the Court's role under the APPA is limited to reviewing the remedy in

relationship to the violations that the United States has alleged in its Complaint, and does not

authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against

that case." *Microsoft*, 56 F.3d at 1459; *see also U.S. Airways*, 38 F. Supp. 3d at 75 (noting that

the court must simply determine whether there is a factual foundation for the government's

decisions such that its conclusions regarding the proposed settlements are reasonable);  *InBev*,

2009 U.S. Dist. LEXIS 84787, at *20 ("the 'public interest' is not to be measured by comparing

the violations alleged in the complaint against those the court believes could have, or even

should have, been alleged").  Because the "court's authority to review the decree depends

entirely on the government's exercising its prosecutorial discretion by bringing a case in the first

place," it follows that "the court is only authorized to review the decree itself," and not to

"effectively redraft the complaint" to inquire into other matters that the United States did not

pursue. *Microsoft*, 56 F.3d at 1459-60.  As this Court confirmed in *SBC Communications*, courts

"cannot look beyond the complaint in making the public interest determination unless the

complaint is drafted so narrowly as to make a mockery of judicial power." *SBC Commc'ns*, 489

F. Supp. 2d at 15.

In its 2004 amendments, Congress made clear its intent to preserve the practical benefits

of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction that

"[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing

or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2); *see also U.S.*

*Airways*, 38 F. Supp. 3d at 76 (indicating that a court is not required to hold an evidentiary

hearing or to permit intervenors as part of its review under the Tunney Act).  The language wrote

into the statute what Congress intended when it enacted the Tunney Act in 1974, as Senator

Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended

proceedings which might have the effect of vitiating the benefits of prompt and less costly

settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Sen.

Tunney).  Rather, the procedure for the public interest determination is left to the discretion of

the Court, with the recognition that the Court's "scope of review remains sharply proscribed by

precedent and the nature of Tunney Act proceedings." *SBC Commc'ns*, 489 F. Supp. 2d at 11.[3]

---

[3] *See United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the
"Tunney Act expressly allows the court to make its public interest determination on the basis of the
competitive impact statement and response to comments alone"); *United States v. Mid-Am. Dairymen,
Inc.*, No. 73-CV-681-W-1, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980, *22 (W.D.Mo. 1977) ("Absent
a showing of corrupt failure of the government to discharge its duty, the Court, in making its public
interest finding, should . . . carefully consider the explanations of the government in the competitive
impact statement and its responses to comments in order to determine whether those explanations are
reasonable under the circumstances."); S. Rep. No. 93-298, at 6 (1973) ("Where the public interest can be
meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should
be utilized.").

A court can make its public interest determination based on the competitive impact statement and response to public comments alone. *U.S. Airways*, 38 F. Supp. 3d at 76.

## VIII. DETERMINATIVE DOCUMENTS

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

Dated:  September 2, 2016

Respectfully submitted,

/s/ Mark A. Merva
Mark A. Merva* (D.C. Bar #451743)
Trial Attorney
United States Department of Justice
Antitrust Division
Litigation III Section
450 Fifth Street, N.W., Suite 4000
Washington, D.C. 20530
Phone: 202-616-1398
Facsimile: 202-514-7308
E-mail: Mark.Merva@usdoj.gov

*Attorney of Record

## CERTIFICATE OF SERVICE

I, Mark A. Merva, of the Antitrust Division of the United States Department of Justice, do hereby certify that true copies of the Complaint, Competitive Impact Statement, Hold Separate Stipulation and Order, Proposed Final Judgment, and Plaintiff's Explanation of Consent Decree Procedures were served this 2nd day of September, 2016, by email, to the following:

**Counsel for Defendant Nexstar Broadcasting Group, Inc.**

Ellen Jakovic
Ian Conner
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005

Ian G. John
601 Lexington Avenue
New York, NY 10022-4611
Phone: 212-446-4665
Ian.john@kirkland.com

**Counsel for Defendant Media General, Inc.**

Bernard A. Nigro Jr. (D.C. Bar #412357)
Fried Frank
801 17th Street, NW
Washington DC  20006
Phone:  202-639-7373
Barry.Nigro@friedfrank.com

/s/  Mark A. Merva
Mark A. Merva